PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ADAM J. SHIRVINSKI,

        *Plaintiff-Appellant,*

        v.

UNITED STATES COAST GUARD;
STEPHEN HOSHOWSKY; BOOZ ALLEN
HAMILTON, INC.; UNITED STATES OF
AMERICA,

        *Defendants-Appellees,*

        and

GLOBAL STRATEGIES GROUP,
INCORPORATED,

        *Defendant.*

No. 10-2424

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Anthony J. Trenga, District Judge.
(1:09-cv-00896-AJT-TRJ)

Argued: January 24, 2012

Decided: March 12, 2012

Before WILKINSON, DUNCAN, and AGEE,
Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Duncan and Judge Agee joined.

**COUNSEL**

**ARGUED:** Matthew Henry Simmons, SIMMONS & ASSO-CIATES, CHARTERED, Bethesda, Maryland, for Appellant. Stephen William Robinson, MCGUIREWOODS, LLP, McLean, Virginia; Dennis Carl Barghaan, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellees. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee United States Coast Guard. Sarah A. Belger, MCGUIREWOODS, LLP, McLean, Virginia, for Appellee Booz Allen Hamilton, Inc.

---

**OPINION**

WILKINSON, Circuit Judge:

In this case, a subcontractor to a subcontractor to a prime contractor with a federal agency brought a procedural due process claim against that agency and tort actions against a separate contractor for allegedly causing the termination of his at-will consulting agreement. Following discovery, the district court granted summary judgment to the defendants. Because permitting these claims to go forward would reward artful pleading and impermissibly constitutionalize state tort law, we affirm the district court.

I.

A.

This case arose out of the United States Coast Guard's Deepwater Acquisition Project, a collection of acquisition programs undertaken to modernize the Coast Guard's deepwater ships and aircraft. Given the scope and complexity of the Deepwater Project, this case boasts a large cast of characters, and we shall do our best to assist the reader in keeping

them straight. In March 2008, Adam Shirvinski, a retired United States Coast Guard Captain, entered into a private at-will consulting agreement with Mohawk Information Systems and Consulting, Inc. ("MISC"). According to the contract, Shirvinski promised to provide consulting services regarding Configuration Management ("CM") and Quality Assurance ("QA") issues to the Coast Guard regarding the Deepwater Project. Under its terms, either party could unilaterally terminate the contract by giving thirty days written notice.

MISC, in turn, was a subcontractor to SFA, Inc. ("SFA"), which had a prime contract with the Coast Guard to work on the Deepwater Project. The Coast Guard had also hired Booz Allen Hamilton, Inc. ("Booz Allen") to work on Deepwater through a separate contract.

Shirvinski began his stint as a private consultant in March 2008 at a Coast Guard facility in Rosslyn, Virginia. Over the next few months, tensions in the workplace arose between Shirvinski and a number of Coast Guard and Booz Allen employees. For example, Shirvinski admitted he told Booz Allen personnel on March 13 that he "was taking over CM functions" and that all CM issues should be brought "to [his] attention." In addition, Shirvinski criticized a CM plan developed by Booz Allen and Stephen Hoshowsky, a civilian Coast Guard employee, and recommended that a Booz Allen employee, Vik Singh, be removed from CM functions on the Deepwater Project. Commander Richard Fontana, the Deputy Project Manager, also began to "receive[ ] multiple complaints" about Shirvinski's "conduct and the way he interacted with people," including charges that he was "brusque and abrasive." After hearing concerns over Shirvinski's behavior, Commander Fontana instructed Hoshowsky to bring any complaints about Shirvinski to his attention.

In accordance with this directive, Hoshowsky sent an email containing a list of issues regarding Shirvinski to Fontana and several other Coast Guard officials on August 6, 2008.

Hoshowsky copied several Booz Allen employees, including Singh, on this email as well. Included in this list of complaints was the charge that Shirvinski "has introduced himself as the CG-933 CM/QA Division Head reporting directly to [the Project Manager] at every meeting and telecom I have attended with him." Several days later, on August 11, Hoshowsky forwarded a copy of this email to Lieutenant Christopher Armstrong. The next day, Lieutenant Armstrong called the office of Lieutenant Commander Michael Gero, the Contracting Officer's Technical Representative, to request Shirvinski's removal from the Deepwater Project. On the morning of August 13, Armstrong forwarded Hoshowsky's email to Gero's deputy in support of his request.

After receiving Hoshowsky's email, Gero passed it along to another Coast Guard official, Contract Specialist Gwendolyn Scott, who was the assistant to Coast Guard Contracting Officer Cheryl Ellis. Gero, Ellis, and Scott then convened to discuss the request to remove Shirvinksi from Deepwater. Following their meeting, Scott notified SFA by email that

> It has come to our attention that Adam Shirvinski, a subcontractor on HSCG23-05-F-TTV002 has violated Sections 1.3.3 and 1.3.4 of the Task Order Performance Work Statement on a number of occasions. We have received reports Mr. Shirvinski has improperly introduced himself as the CG-933 CM/QA Division Head and failed to adhere to the task order requirement to properly identify himself as a contractor. . . . We ask[ ] that you take corrective action immediately and update us regarding the outcome of this matter. Please contact us if you have any questions.

SFA's Vice President of Business Administration, Shirley Place, responded, "I am immediately looking into this, and I will be back with you shortly. We apologize in advance, we

will perform an investigation, and we will rectify the situation asap!"

Later that day, SFA sent a letter to MISC stating that because the "Coast Guard has advised us that Mr. Shirvinski . . . has violated Coast Guard policy," he "should be terminated immediately and will no longer be allowed to perform on any [SFA] contract or subcontract." That evening, MISC's Operations Vice President, Captain Joseph Ryan, informed Shirvinski that "SFA directed MISC to terminate your services" on the Deepwater Project and that "[i]n accordance with SFA's direction, your services are terminated on that task."

B.

On August 11, 2009, Shirvinski filed a complaint in federal court against Hoshowsky, the Coast Guard, Booz Allen, and SFA's successor, Global Strategies Group (North America), Inc., containing state law claims of defamation, conspiracy, and tortious interference. His sole cause of action against the Coast Guard was a defamation claim seeking a declaratory judgment ordering it to amend its records to show that the allegations against him were false.

The district court permitted the United States to substitute itself for Hoshowsky under the Federal Employees Liability Reform and Tort Compensation Act, *see* 28 U.S.C. § 2679(d), and then dismissed Shirvinski's claims against the United States because he had failed to pursue administrative remedies as required by the Federal Tort Claims Act ("FTCA"). *See id.* § 2675(a). The court also dismissed his defamation claim against the Coast Guard because it lacked jurisdiction under the FTCA to hear common law tort suits for equitable relief, *see id.* § 1346(b)(1), and his claims against SFA's successor because his allegations were either legally insufficient or barred by Virginia's statute of limitations.

After the bulk of his original claims had been rejected by the district court, Shirvinski decided to pursue a new strategy. To that end, he filed a second amended complaint on March 30, 2010.* This time, he brought a federal procedural due process claim against the Coast Guard seeking similar equitable relief and state tort claims against Booz Allen for damages. Following discovery, both defendants moved for summary judgment.

The district court granted their motions on all counts. It dismissed Shirvinski's procedural due process claim against the Coast Guard because it found that he was unable to show a constitutional injury. With regard to Booz Allen, the court dismissed Shirvinski's common law and statutory conspiracy claims because he could not show that Booz Allen conspired to remove him from Deepwater "through unlawful means." It also dismissed his tortious interference with contract claim because this cause of action did not extend to an at-will contract and his claim for tortious interference with prospective economic advantage because it found that Booz Allen did not employ any improper methods.

Shirvinski appeals the district court's ruling on all counts except for his tortious interference with contract claim. We review a grant of summary judgment *de novo* and apply the same standards as the district court. *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). We shall take up the claims against the Coast Guard and Booz Allen in turn.

## II.

We first address Shirvinski's procedural due process claim against the Coast Guard. In order to prevail, appellant must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and

---

*Shirvinski had filed his first amended complaint a few months after the case began.

(3) that the procedures employed were constitutionally inadequate." *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011). To that end, he argues that without providing him procedural protections, the Coast Guard deprived him of his liberty interest in his reputation by "requesting his removal from" the Deepwater Project "while spreading defamatory statements about him as a reason for this request." Appellant's Br. at 40. For two reasons, we reject this claim.

A.

The first problem with Shirvinski's argument is that even if the Coast Guard did request his removal from the Deepwater Project, he has not suffered a constitutionally cognizable injury. Appellant assumes that he "need only show . . . removal from [a] contract" accompanied by "an untrue government statement about him alleging serious character defect" to demonstrate a deprivation of a protected liberty interest. *Id.* at 44. However, a government's allegedly "defamatory" request that its prime contractor no longer assign one of its subcontractors to a particular government contract fails to rise to the level of a constitutional injury.

The Supreme Court's consistent guidance in this area counsels against finding constitutional injury here. Since *Paul v. Davis*, 424 U.S. 693, 701 (1976), the Court has repeatedly admonished judges to be wary of turning the Due Process Clause into "a font of tort law" by permitting plaintiffs to constitutionalize state tort claims through artful pleading. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 332 (1986). For that reason, the Supreme Court has required plaintiffs in cases involving allegedly defamatory statements by the government to show more than reputational injury in order to prevail on a constitutional claim. "[I]njury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process Clause]." *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). Instead, a plaintiff must demonstrate that his reputational injury was accompanied by a state action that "distinctly altered or extinguished"

his legal status if he wants to succeed. *See Paul*, 424 U.S. at 711.

In the context of public employment, this change in status occurs when the government acting as an employer discharges one of its employees. *See id.* at 705 (noting that an "effect on the legal status of . . . a person" includes the "loss of government employment"). As appellant points out, we have recognized that a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest. *See Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006). But Shirvinski was neither an employee of nor in a direct contractual relationship with the Coast Guard. Nor, as he concedes, did the Coast Guard "formally bar[ ]" him "from government contracting." Appellant's Br. at 46. Because Shirvinski did not suffer a loss of public employment, this line of cases is not germane to our analysis.

To be sure, the Coast Guard's action may have affected Shirvinski's *private* employment prospects with SFA and MISC. But unlike the loss of a government job, that injury does not work a change in legal status. Once again, *Paul v. Davis* is instructive. The plaintiff in that case was a private employee who was reprimanded by his supervisor after local police departments published a list of shoplifters that included his name. 424 U.S. at 694-96. Although he contended that the government's action "would seriously impair his future employment opportunities," *id.* at 697, the Supreme Court rejected his claim, noting that it "has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Id.* at 706.

Like the published list of shoplifters at issue in *Paul*, the Coast Guard's concerns may have restricted Shirvinski's private employment opportunities by causing MISC to terminate

his consulting agreement and SFA to refuse to work with him again. But even if the Coast Guard's concerns "undoubtedly . . . impair[ed] his future employment prospects," that fact alone does not amount to a *constitutional* injury. *See Siegert*, 500 U.S. at 234; *see also Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) ("[A]ction which inflicts a stigma on the reputation of a plaintiff causing that plaintiff hardship in obtaining employment is harm to reputation that does not rise to the level of a constitutional deprivation."). The Supreme Court's repeated admonitions prevent us from concluding that an agency's request that a prime contractor no longer assign a subcontractor to a particular government project amounts to an adjudication of legal status.

Diluting the requirement of a change in legal status would needlessly court conflict with a sister circuit as well. The District of Columbia Circuit has made clear that the removal of a subcontractor from a particular government contract need not be an injury of constitutional magnitude. In *Kartseva v. Department of State*, 37 F.3d 1524, 1525 (D.C. Cir. 1994), the court faced a procedural due process claim brought by a subcontractor who lost her job with a prime contractor after a government agency declared her ineligible to work on a particular contract for counterintelligence reasons. As the court noted, a subcontractor in this situation must show that the government altered his "status under law" by either (1) "formally or automatically exclud[ing]" him from a "category of future [government] contracts or from other government employment opportunities," or (2) "largely precluding" him from pursuing his "chosen career." *Id.* at 1527-28. In other words, Shirvinski must show that his "skills were . . . rendered largely unmarketable as a result of the agency's acts." *See Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995).

Shirvinski cannot meet this demanding test. Rather than being "foreclosed from reentering the field," he has "merely lost one position in [his] profession." *See Kartseva*, 37 F.3d

at 1529. He concedes he is not formally excluded from government contracts, and indeed multiple sources—including the Coast Guard's Chief for Formal Contracts Division I, Captain Joseph Ryan of MISC, and one of Shirvinski's contacts at another government subcontractor—each confirmed that he can still operate as a government subcontractor. Like the district court, we believe that "Shirvinski has failed to present evidence sufficient for a reasonable fact finder to conclude that he is effectively barred from pursuing his chosen trade." Were we to subject appellant's claim to a less demanding standard, we would create a circuit split in an area of law where uniformity is particularly desirable. The law of government contracts requires a modicum of stability across jurisdictions, and we do no one a service by creating unnecessary divergences in this field.

The facts of this case also make clear that allowing Shirvinski's constitutional claim to go forward would do exactly what the Supreme Court has warned us not to do: transform the Fifth Amendment's Due Process Clause into "a font of tort law" in the field of government contracts. *See Paul*, 424 U.S. at 701. As the history of this lawsuit illustrates, Shirvinski's procedural due process claim is nothing more than an ordinary defamation action dressed in constitutional garb. In his initial complaint, Shirvinski brought a defamation suit against the Coast Guard pursuing the same equitable relief—a declaratory judgment ordering it to amend its records—that he seeks today. The district court dismissed that suit because it could not hear common law tort claims seeking equitable relief under the FTCA. *See* 28 U.S.C. § 1346(b)(1); *Talbert v. United States*, 932 F.2d 1064, 1065-66 (4th Cir. 1991). And even if Shirvinski had sought damages from the Coast Guard, his claim would have been barred by the FTCA's preservation of sovereign immunity against defamation actions. *See* 28 U.S.C. § 2680(h).

After learning that the FTCA barred him from pursuing this common law defamation action, Shirvinski repackaged his

case against the Coast Guard as a procedural due process suit. This overlooks the fact that "[o]ur Constitution deals with the large concerns of the governors and the governed." *Daniels*, 474 U.S. at 332. It does not "purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Id.* Appellant's claim for relief is more appropriately the subject of common law remedies than constitutional guarantees. For instance, he might have brought a breach of contract action against MISC but chose not to do so, perhaps because the at-will nature of his contract limited the prospect of available relief. Alternatively, he could have brought—and indeed did bring—defamation and tortious interference claims against SFA's successor, but these were dismissed as untimely or insufficiently pled. Whether Shirvinski actually has a remedy in contract against MISC or a remedy in tort against SFA's successor is of course beyond the purview of this appeal. But the fact that he either did not bring or fruitfully pursue these other forms of relief does not give him the right to move against the government on constitutional grounds.

Allowing this claim to proceed would only reward artful pleading to the detriment of public-private partnerships. The government "has a legitimate interest in promoting efficiency and integrity in the discharge of official duties, and in maintaining proper discipline in the public service," *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008) (internal quotation marks omitted), and this need for "broad authority in managing . . . operations does not turn" on whether government contractors or civil servants are involved. *NASA v. Nelson*, 131 S. Ct. 746, 758-59 (2011). But if the government faces constitutional liability whenever it informs a prime contractor of allegations against one of its subcontractors, its ability to manage those who carry out its mission would be imperiled. The threat of liability would deter public officials from communicating their concerns to contractors about the conduct of subcontractors, even if those concerns were entirely well-founded. This chilling effect would over time

inhibit frank assessments of a contractor's work and insulate even poor contractual performance from appropriate correction.

The imposition of needless burdens on communication necessary for the functioning of government is what the FTCA's defamation exception was designed to prevent. That exception was added to the FTCA to ensure "that government officials should not be hampered in their writing and speaking by the possibility that their actions would give rise to government liability." *Quinones v. United States*, 492 F.2d 1269, 1280 (3d Cir. 1974). Permitting Shirvinski to use the Due Process Clause to do an end run around this exception would thus work the precise harms Congress sought to avoid in the FTCA and fly in the face of *Paul v. Davis* and its progeny.

B.

Shirvinski has not only failed to allege a constitutionally cognizable injury. His claim also fails because the Coast Guard did not deprive him of a liberty interest without providing due process. Instead, SFA—a private entity—instructed MISC—another private entity—that Shirvinski "should be terminated immediately" and MISC complied by promptly ending his consulting agreement. This absence of state action is fatal to his constitutional claim. For "[u]nless there has been a 'deprivation' by 'state action,' the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant." *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988).

To surmount this hurdle, Shirvinski contends that the Coast Guard requested his immediate removal from the Deepwater Project and is therefore responsible for the termination of his contract. But assigning constitutional liability to government agencies for the conduct of private parties is not something we do lightly. The government "normally can be held responsible for a private decision only when it has exercised coer-

cive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Shirvinski cannot make this showing. As the district court noted, there is no admissible evidence that "shows an actual request or directive from the Coast Guard to SFA that Shirvinski be removed." Instead, the record indicates that the Coast Guard expected SFA to conduct an investigation into the allegations against him before taking action. According to Gwendolyn Scott, the assistant to Contracting Officer Ellis, she did not contact Shirvinski upon learning of the allegations because he "wasn't an employee of the Coast Guard and we did not have a direct contractual relationship with [him]." As she pointed out, the Coast Guard "paid SFA to manage their employees and subcontractors, and it was their job to investigate these allegations and let us know what they were going to do to correct them if they were true, or tell us if they weren't true."

The Coast Guard's contractually-based expectation that SFA would provide some procedural safeguards before terminating Shirvinski was hardly unreasonable. After Scott informed SFA of the allegations against Shirvinski and asked it to "take corrective action," SFA's Vice President of Business Administration, Shirley Place, promised to "perform an investigation." And once Contracting Officer Ellis learned of SFA's decision, she sent an email to Place to "confirm[ ]" that Place had "indicated that [she] understood that the government did not direct the removal of SFA's employee" and that SFA had performed its "own investigation and determined that removal was appropriate." The Coast Guard thus had every reason to believe that SFA provided Shirvinski with adequate procedures before removing him from the Deepwater Project.

In fact, this was appellant's consistent position until the district court dismissed SFA's successor from the suit. In his ini-

tial complaint, Shirvinski alleged that there "was no doubt . . . that SFA was the ultimate decision maker, whereas the Coast Guard had merely requested some form of unspecified 'corrective action.'" Shirvinski similarly asserted in his first amended complaint that the "Coast Guard did not intend its email to be dispositive," but instead "communicated to SFA that it was *not* directing Mr. Shirvinski's removal." (emphasis in original). But as soon as SFA's successor was dismissed from the suit, Shirvinski changed his story. In his second amended complaint, he contended that the Coast Guard requested his removal and then "attempted to cover up its actions by laying groundwork to claim that the decision to terminate [him] originated from SFA." This strategic shift in narratives only undermines the credibility of his present claim.

The record is thus replete with evidence that the Coast Guard never requested Shirvinski's immediate removal but instead expected SFA to investigate the allegations. The district court nevertheless refused to grant summary judgment on this basis largely because Lieutenant Armstrong had asked Lieutenant Commander Gero to remove Shirvinski from Deepwater and then claimed credit for his removal in a later email. The problem with this analysis is that Armstrong lacked authority to order SFA to remove one of its subcontractors on behalf of the Coast Guard. That power was instead vested in Contracting Officer Ellis, who had notified SFA early on that she was "the Contracting Officer responsible for the contract" and that except for technical issues, SFA should "contact [her] . . . on all other matters pertaining to the contract."

Thus, even though Lieutenant Armstrong sought Shirvinski's removal, the ultimate decision was not his to make. Unless appellant can provide evidence that Contracting Officer Ellis asked SFA to remove him, he cannot prove that the Coast Guard was responsible. As MISC's Captain Ryan observed, in the field of government contracts, "if the state-

ment [did] not come from the contracting officer . . . it didn't happen." Appellant's failure to provide evidence that Ellis requested his removal requires the dismissal of his procedural due process claim.

In sum, we cannot find fault with the Coast Guard's conduct in this case. It neither provided "significant encouragement" to nor "exercised coercive power" over SFA in that contractor's decision to order the removal of Shirvinski. *See Blum*, 457 U.S. at 1004. Nor did it request Shirvinski's immediate removal from the Deepwater Project, but instead gave SFA time to look into the allegations. *See Merritt v. Mackey*, 827 F.2d 1368, 1370-72 (9th Cir. 1987) (holding that an employee of a government contractor who was fired after government officials demanded his *immediate* termination could state a procedural due process claim). The Coast Guard was in fact at several removes from the dismissal decision. To hold it constitutionally liable here would penalize the agency for making a rather innocuous and wholly understandable request. The agency could hardly be expected to do nothing when serious concerns about subcontractor performance were brought to its attention. What the Coast Guard did was to ask its prime contractor to investigate allegations against one of its subcontractor's subcontractors. That the prime contractor subsequently took action leading to the termination of that subcontractor's employment contract does not render the Coast Guard constitutionally liable.

We cannot casually sweep the Coast Guard into every interaction between two privately contracting parties. Shirvinski was not a government employee. He had no contractual relationship with the Coast Guard either. To seek to affix responsibility here on the Coast Guard would not only expand the scope of state action, but burden the government contracting process with additional transaction costs. For "the mere fact that state action sets in motion a chain of events that ultimately leads to loss of a plaintiff's protected interest does not of itself establish that there has been a 'deprivation by state

action' in the constitutional sense." *Stone*, 855 F.2d at 173. Both because Shirvinski has failed to allege infringement of a constitutionally cognizable liberty interest and because he has failed to show that the government denied him adequate process, we affirm the district court's dismissal of his constitutional claim.

## III.

We now turn to Shirvinski's state tort claims against Booz Allen. On appeal, he pursues three business tort actions against Booz Allen under Virginia law—common law civil conspiracy, statutory conspiracy, and tortious interference with prospective economic advantage—for its alleged involvement in removing him from the Deepwater Project. As the district court found, however, "there is no evidence that Booz Allen had any interactions with MISC or SFA" or "participated in the Coast Guard's decision" to contact SFA or even "requested that the Coast Guard terminate Shirvinski's involvement" in Deepwater. To shore up his claims, Shirvinski contends that Booz Allen, primarily through its employee Vik Singh, worked with Coast Guard civilian employee Stephen Hoshowsky to remove him from Deepwater by spreading defamatory allegations. This argument fails in all three of its forms.

## A.

We first address Shirvinski's civil conspiracy claim under Virginia common law. To succeed, appellant must show that "two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995). Like the district court, we acknowledge that there is evidence suggesting that Hoshowsky and Singh believed Shirvinski should be removed from Deepwater. Specifically, on August 7, 2008, Hoshowsky sent an email to

Singh declaring, "We need to have Mr. S fired! He is way out side of his CM box!" Soon thereafter, Singh replied, "Ya." But as appellant has conceded, the removal of a subcontractor from a government project is not an unlawful end. Instead, he argues that Singh and Hoshowsky achieved this goal through the unlawful means of defamation. According to Shirvinski, Singh participated in drafting the August 6 email containing the charge that he had introduced himself as the CM/QA Division Head.

We do not agree. Shrivinski offers nothing more than sheer speculation to support this claim. As he admitted in his deposition, he has no direct evidence that Singh either "played any role in any part of the drafting of" or "had seen" the August 6 email prior to receiving it that afternoon. Shirvinski consequently attempts to build his case through pure inference. He first relies on the fact that on August 6, Hoshowsky and Singh conferred sometime between 10:27 a.m.—when Singh sent an email to Hoshowsky stating that "Adam is going all over the place without telling us. . . . I need to talk to you"—and 2:03 p.m.—when Hoshowsky sent out the allegedly defamatory email. But that sequence of events says nothing about whether they agreed to draft that email during the conversation. In fact, Singh and Hoshowsky each testified in their depositions that they did not discuss this email or its contents before it was sent.

Shirvinski also contends that correspondence between Singh and Hoshowsky a few hours after the transmission of the allegedly defamatory email indicates Singh's involvement in the drafting process. As appellant observes, Hoshowsky emailed Singh at 5:15 p.m. to inquire whether Coast Guard officials had seen his earlier email and Singh soon replied with an update about its impact. In his request, Hoshowsky also noted the possibility of having "one more thing to add to the list of 'Issues with Adam.'" Shirvinski believes this proves that the two men had prepared the list of allegations contained in Hoshowsky's afternoon email. But discussing the

impact of an email does not prove authorship. Nor does Hoshowsky's reference to a "list of 'Issues with Adam'" demonstrate that Singh was responsible for the list's creation.

In short, the only way we could conclude that Singh helped draft Hoshowsky's email is "through mere speculation or the building of one inference upon another," both of which are insufficient justifications for proceeding to trial. *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008). As the district court found, "there is no direct evidence that Singh . . . participated in the composition of the August 6 e-mail, or even knew about the fact or substance of the e-mail until [he] received a copy." All Shirvinski is left with is an allegation that two persons on a government project were dissatisfied with a third person's performance. But that sort of thing happens all the time in any team venture, and to hold that the communication here formed an actionable civil conspiracy would be to strain Virginia law to the breaking point. *See Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007) ("[I]n Virginia, a common law claim of civil conspiracy generally requires proof that the underlying tort was committed."). We therefore affirm the district court's dismissal of Shirvinski's common law civil conspiracy claim.

B.

Shirvinski's statutory conspiracy claim fares no better. Under Virginia's business conspiracy statute, injured parties can obtain treble damages against "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va. Code Ann. §§ 18.2-499-.2-500. Appellant's claim under this statute falters on multiple grounds.

To start, as with common law civil conspiracy, this statute requires proof "that the defendants have combined . . . to

accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1284 (4th Cir. 1987) (internal quotation marks omitted). For the reasons discussed above, Shirvinski cannot make this showing. *See supra* Part III.A.

Appellant also cannot demonstrate an injury to a business interest. Despite its broad language, it is well-settled that this statute applies only to injuries "to business and property interests, not to personal or employment interests." *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003). Shirvinski's injuries, however, are of a personal dimension. At the time he was removed from the Deepwater Project, he neither owned a company, did business as a separate organization, nor had a separate tax identification number for his contractor status. Thus, appellant suffered damage only to his *personal* employment prospects. But because "injury to personal reputation ordinarily causes damage to one's business or profession**,** nearly every defamation action would fall within" the statute's ambit if we permitted such claims to proceed. *See Moore v. Allied Chem. Corp.*, 480 F. Supp. 364, 375 n.3 (E.D. Va. 1979); *see also Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (rejecting a business conspiracy claim based on "injury to the professional reputation of the plaintiffs" because it was "in essence, an action in slander and libel"). Virginia's business conspiracy statute was not designed to provide treble damages for defamation suits cloaked as conspiracy claims. We affirm the district court on this count as well.

## C.

Finally, Shirvinski challenges the district court's grant of summary judgment on his claim for tortious interference with prospective economic advantage. To succeed on this action under Virginia law, Shirvinski must at a minimum prove that Singh "employed *improper* methods" in interfering with his

business expectancy. *See Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987) (emphasis in original) (internal quotation marks and citation omitted). He cannot make this showing.

Appellant appears to forget that liability for this sort of tortious interference is not casually triggered. Interference involves improper methods "if it is illegal, independently tortious, or violates an established standard of trade or profession." *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011). Singh did nothing that rises to this level of misconduct. At worst, his efforts in seeking Shirvinski's termination were "actions solely motivated by spite, ill will and malice," which cannot constitute improper methods under Virginia law. *Id.* at 871.

As previously discussed, there is no evidence indicating that Singh triggered Shirvinski's removal through any illegal or independently tortious activities. It is important to keep in mind that Singh simply agreed with a co-worker's assessment that another contractor should be terminated based on their shared perception that he was acting outside the scope of authority. While Shirvinski may be frustrated over his co-workers' conclusion, that does not give him the right to hold them liable in tort. This cause of action provides redress for acts akin to "violence, threats or intimidation, bribery, [or] unfounded litigation," *Duggin*, 360 S.E.2d at 836, not the ordinary interpersonal conflicts of the workplace. The workplace is rife with personal conflicts, turf fights, misunderstandings and disagreements, and the courts cannot be expected to sort through them all. "[T]he law will not provide relief to every disgruntled player in the rough-and-tumble world comprising the competitive marketplace," but "only where the plaintiff can prove that the third party's actions . . . fell so far outside the accepted practice of that 'rough-and-tumble world' as to constitute improper methods." *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 722 (Va. 2011).

For us to expand liability for tortious interference—or conspiracy for that matter—to encompass Singh's conduct would work inestimable damage to public-private partnerships. The effective execution of a government contract depends upon candor and teamwork between public and private employees. To penalize Singh's actions here would render unlawful unpleasant but necessary communications between government employees and contractors over problems their co-workers were causing in the workplace. Artfully pled business tort actions can threaten valuable speech just as much as defamation claims can. "Authority [and] common sense . . . dictate that if [a] letter is privileged against suit for defamation, it must also be protected in an action for interference with business." *McLaughlin v. Copeland*, 455 F. Supp. 749, 752 (D. Del. 1978); *see also Barr v. Matteo*, 360 U.S. 564, 569 (1959) (plurality opinion) (acknowledging the "law of privilege as a defense . . . to civil damage suits for defamation *and kindred torts*") (emphasis added). We thus decline to expand the reach of these actions far beyond what Virginia's highest court has authorized. The district court was right to dismiss Shirvinski's tortious interference claim.

## IV.

In the end, Shirvinski's case involves both the wrong defendants and the wrong claims. Overlooking the most obvious parties, he goes after the most peripheral. And rather than pursue ordinary common law remedies, he spins the termination of a private at-will consulting agreement into a case involving conspiracy, treble damages, and constitutional guarantees. But plaintiff may not fashion such an extraordinary lawsuit out of the ordinary happenings of life. The damage to communications in the government contracting process and to valuable public-private partnerships this action would cause has been amply set forth in prior Supreme Court decisions as well as our own precedent and that of the Virginia Supreme Court. We shall affirm the judgment of the district court.

*AFFIRMED*