RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0352p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FLAVIA PICHIORRI, PH.D.,

*Plaintiff-Appellant*,

*v.*

No. 24-3918

ARTHUR BURGHES; BRANDON BIESIDADECKI; JONATHAN DAVIS; JILL A. RAFAEL-FORTNEY; YUTONG ZHAO; THOMAS HUND; LOREN WOLD; COLLEEN RUPP; PETER MOHLER; OHIO STATE UNIVERSITY BOARD OF TRUSTEES,

*Defendants-Appellees*.

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-01442—Edmund A. Sargus, Jr., District Judge.

Decided and Filed:  December 19, 2025

Before:  WHITE, STRANCH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Renny J. Tyson, RENNY J. TYSON CO., LPA, Columbus, Ohio, William W. Patmon, III, THE PATMON LAW FIRM, LLC, Columbus, Ohio, for Appellant.  Michael H. Carpenter, Timothy R. Bricker, Gregory R. Dick, CARPENTER LIPPS LLP, Columbus, Ohio, for Appellees.

_____

## OPINION

_____

MURPHY, Circuit Judge.  Dr. Flavia Pichiorri published many articles while working as a research scientist at The Ohio State University.  Years after Pichiorri left Ohio State, though, a university committee found that she had committed research misconduct in some of these

articles.  The committee later informed the relevant medical journals and her current employer of the misconduct.  Pichiorri disagreed with the committee's findings and believed that its disclosures to these third parties violated the Constitution.  But the district court correctly found that sovereign immunity shielded some of the university defendants from this suit and that Pichiorri's other due-process claims failed on the merits.  We thus affirm the dismissal of Pichiorri's complaint.

I

Because the district court dismissed Dr. Pichiorri's complaint at the outset of her case, we must treat its well-pleaded factual allegations as true on appeal.  *See Blackwell v. Nocerini*, 123 F.4th 479, 482, 486 (6th Cir. 2024).  We thus describe the events using those allegations alone, while recognizing that Pichiorri has yet to support the allegations with concrete evidence.  *See id.*

Pichiorri's career has focused on research for cancer, including multiple myeloma and leukemia.  Am. Compl., R.37, PageID 275–76.  She has authored or coauthored over one hundred publications.  *Id.*, PageID 276.  She has also "developed compounds and produced preclinical data" used in clinical trials.  *Id.*  And she has taught seminars and trained scientists. *Id.*

Pichiorri had a productive relationship with Ohio State for about a dozen years.  She began as a "visiting Ph.D. student" in 2004.  *Id.*, PageID 275.  After she obtained her doctorate from an Italian university in 2006, she became a researcher and later a research scientist in a lab run by Dr. Carlo Croce in Ohio State's Department of Molecular Virology, Immunology and Medical Genetics.  *Id.*  She served in this research role until 2011 when she became an assistant professor in Ohio State's College of Medicine.  *Id.*  Pichiorri left Ohio State (by all accounts on good terms) in August 2016.  *Id.*  She is now a professor at the City of Hope Medical Center in California.  *Id.*

While working in Croce's lab at Ohio State, Pichiorri coauthored several articles, including what her complaint calls Manuscripts 1, 2, and 5.  *Id.*, PageID 276–77.  (Thankfully, we need not try to describe the manuscripts' complex topics to resolve this appeal.)  The cancer-research community "applauded" these articles.  *Id.*, PageID 277.  And other scientists have

duplicated their findings, which "have never been refuted." *Id.*, PageID 277, 285. In fact, "more than seven hundred (700) researchers" have relied on the research findings over the years. *Id.*, PageID 284. And Ohio State itself has used the findings to seek patents. *Id.*, PageID 284–85.

After Pichiorri left Ohio State, however, unnamed individuals leveled "allegations of potential research misconduct" against Pichiorri for these manuscripts. *Id.*, PageID 277. These individuals made the allegations between March 2017 and November 2018. *Id.* Ohio State responded by putting together a committee ("the College of Medicine Investigation Committee") to investigate the alleged misconduct. *Id.*, PageID 274, 277.

Because Ohio State accepts federal funds, the committee's investigation needed to follow standards established by the Federal Office of Research Integrity. *Id.*, PageID 278. These standards treat a researcher's actions as "research misconduct" only if the actions rise to a certain level of malfeasance. *Id.* (citing 42 C.F.R. § 93.103(a)–(c) (2005)). So investigators may not treat an "honest error" as misconduct. *Id.*, PageID 279. Although scientific articles often contain these types of "[h]onest mistakes," their authors typically correct the errors through amendments. *Id.* And consistent with the federal standards, investigators do not typically treat the mistakes as misconduct. *Id.*, PageID 278–79. Universities also must keep their investigations confidential under the federal standards. *Id.*, PageID 278 (citing 42 C.F.R. § 93.108 (2005)).

Pichiorri cooperated with the committee's investigation. *Id.*, PageID 277–79. She recognized some honest errors in the manuscripts. *Id.*, PageID 279. A figure in one manuscript had a "mistake in the legend," and "images" in other manuscripts were allegedly false. *Id.* She thus submitted corrections and verified data to prove the validity of her conclusions despite the mistakes. *Id.* Pichiorri also placed the blame for the mistakes on her working conditions. Ohio State did not adequately "train[]" scientists and forced them "to work long days and nights" that made them prone to err. *Id.*, PageID 280–81. Pichiorri placed further blame for the mistakes on her colleagues at Ohio State—who generated the underlying false data. *Id.*, PageID 281. She exercised reasonable diligence when reviewing the data and merely failed to catch the errors. *Id.*

Ultimately, the committee issued a report in 2020. *Id.*, PageID 283. The report found that Pichiorri (and another female scientist) had committed research misconduct. *Id.*, PageID 279–81. It recommended that Ohio State bar Pichiorri from future employment with the university. *Id.*, PageID 280. It also recommended that the relevant journals retract Manuscripts 1 and 2 and correct Manuscript 5. *Id.*, PageID 282. On the other hand, the report did not find fault with Croce or any other male scientist who helped with the manuscripts. *Id.*, PageID 279–83.

According to the complaint, the committee departed from the Office of Research Integrity's federal standards to make its findings. *Id.*, PageID 280. The committee allegedly created its "own" unique research-misconduct rules for Pichiorri. *Id.* It did not require evidence that Pichiorri acted with an intent to defraud or even with a reckless disregard for the truth. *Id.* It also refused to disclose "exculpatory evidence" to Pichiorri that would have shown that she had not committed misconduct. *Id.* And it did not follow the "preponderance of the evidence" burden of proof that the federal standards require for a research-misconduct finding. *Id.*, PageID 285.

The committee did not just disclose the report when it officially came out in 2020. It also re-sent the report to others (and repeated its misconduct findings) over the years. It alerted "prestigious journals" about the report as late as July and November 2022. *Id.*, PageID 283. And it notified the City of Hope Medical Center, Pichiorri's employer, in October 2022. *Id.*

These disclosures have injured Pichiorri. Among other things, the disclosures caused her ongoing "public humiliation and emotional distress[.]" *Id.* They also "harmed her reputation and standing in the research community." *Id.*, PageID 284. And they allegedly caused the National Institutes of Health to remove her from a "coveted panel" on which she had long served. *Id.*, PageID 283–84. Lastly, the disclosures led the City of Hope Medical Center to investigate all her past work funded by the National Institutes of Health. *Id.*, PageID 283. Although the City of Hope found no other misconduct, the investigation reduced "her role as a senior leader" there. *Id.* And one of her employees quit as a result. *Id.*

Worried about continued disclosures of the report, Pichiorri sued the Ohio State Board of Trustees, the investigating committee's eight members, and an Ohio State research officer in April 2023.  Pichiorri alleged a mix of federal claims (under 42 U.S.C. § 1983) and state claims (under Ohio common law).  As for her federal claims, Pichiorri alleged that Ohio State violated substantive due process, procedural due process, and equal protection.  As for her state claims, Pichiorri alleged that Ohio State acted negligently, defamed her, invaded her privacy, tortiously interfered with her business relationships, breached its implied contract, intentionally inflicted emotional distress, and committed fraud.  Pichiorri sought only equitable relief (not damages).

The district court dismissed her complaint on three grounds.  *See Pichiorri v. Burghes*, 2024 WL 4290257, at *11 (S.D. Ohio Sept. 25, 2024).  The court started with sovereign immunity.  It held that this immunity barred all her claims against the Ohio State Board of Trustees and her state (but not federal) claims against the Ohio State officials in their official capacities.  *See id.* at *4–5.  The court next turned to the statute of limitations.  It found that the limitations period had run on Pichiorri's substantive-due-process and equal-protection claims but not her procedural-due-process claim.  *See id.* at *5–7.  The court lastly found that all these constitutional claims failed on the merits anyway.  *See id.* at *8–10.  And without any remaining federal claims, the court declined to exercise supplemental jurisdiction over Pichiorri's state-law claims against the individual officials in their personal capacities.  *Id.* at *10.  Pichiorri appealed. We review the district court's decision de novo.  *See Mohlman v. Fin. Indus. Regul. Auth.*, 977 F.3d 556, 558 (6th Cir. 2020).

II

On appeal, Pichiorri takes issue with each of the district court's three reasons for dismissing her federal claims.  But we need not reach all her arguments.  When a district court denies a claim on two *independent* grounds, we may affirm based on only *one* of them.  *See Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 884 (6th Cir. 2024); *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562–63 (6th Cir. 2013) (en banc).  We thus need not decide whether Pichiorri sued within the time allowed by § 1983's limitations period because Pichiorri's constitutional theories fail to make out "a plausible claim" on the merits.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Indeed, Pichiorri's appellate briefing did not even challenge the district

court's conclusion that her equal-protection claim failed to state a claim. She has thus forfeited this "unbriefed ground." *Blick*, 105 F.4th at 884. That forfeiture leaves only her two due-process claims.

That said, we must add one caveat to this analysis. Courts must ensure themselves of their subject-matter jurisdiction before resolving any merits issues. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–102 (1998). And courts have treated sovereign immunity as a limit on their jurisdiction over lawsuits against the States. *See Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 473–75 (6th Cir. 2006). At the same time, though, States may waive this immunity (something that litigants cannot do for other jurisdictional defects). *See id.* at 474. So the circuit courts have split over whether they may resolve a claim on the merits ahead of sovereign immunity. *See id.* at 476. For our part, we held that sovereign immunity qualifies as a "jurisdictional bar" and not an "affirmative defense" in *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). *Russell* also noted that sovereign immunity "must be decided before the merits" when the State invokes the immunity. *Id.* Yet we also held in *Nair* that the State may waive this order of operations by showing a preference for deciding the merits ahead of immunity. *See* 443 F.3d at 476–77. What do all these complexities mean for this case? We are not sure, but we need not opine on them. We will bypass any order-of-operation issues by simply assuming that we must resolve sovereign immunity first. We will then turn to the district court's rulings on the merits.

A

The Constitution grants the States sovereign immunity from a private party's suit against them in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). This immunity covers suits not just against the States themselves but also against their state agencies and state officers sued in their official capacities. *See Lewis v. Clarke*, 581 U.S. 155, 162 (2017); *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Likewise, § 1983 permits suits only against a "person"—a word that the Supreme Court has held does not include the States (or state entities or officials sued in their official capacities). 42 U.S.C. § 1983; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63–71 (1989). But this immunity comes with one noteworthy exception. Under *Ex Parte Young*, 209 U.S. 123 (1908), federal courts may issue injunctions that prohibit

state officials sued in their official capacities from taking actions that violate *federal* law. *See Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 515 (6th Cir. 2023).

The district court correctly recognized that sovereign immunity bars many claims here (and that those claims do not fall within § 1983's cause of action). As an initial matter, Pichiorri does not dispute that sovereign immunity would generally cover Ohio State's Board of Trustees, a suable entity that qualifies as an arm of Ohio. *See Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 301–03 (6th Cir. 1984); *see also Thomas v. Noder-Love*, 621 F. App'x 825, 831 (6th Cir. 2015). Next, sovereign immunity covers the university officials sued in their official capacities. *See Graham*, 473 U.S. at 165–66. And while the *Ex Parte Young* exception might save a request for an injunction on *federal* claims, that exception does not allow a federal court to enjoin state officials for violations of *state* law. *See Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005) (en banc). As a result, Pichiorri also does not dispute that sovereign immunity would generally prohibit her from seeking to enjoin the university officials from committing the alleged torts.

Pichiorri instead offers a single argument against sovereign immunity. She contends that Ohio State and its officials functioned as an arm of the federal government rather than Ohio because the university received federal research funds and had to follow federal regulations when investigating her. But Pichiorri did not make this argument in the district court. Because she has raised the argument "too late," she has forfeited it. *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1012 (6th Cir. 2022). And she does not offer any exceptional reasons why we should excuse this forfeiture, so we opt not to consider her argument for the first time on appeal. *See id.*

All told, then, sovereign immunity bars all claims against the Board of Trustees and all state claims against the officials in their official capacities.

B

This conclusion leaves Pichiorri's two due-process claims against the Ohio State officials in their official capacities. The Fourteenth Amendment makes clear that a State may not "deprive any person of life, liberty, or property" unless the State provides the person with "due

process of law[.]" U.S. Const. amend. XIV, § 1.  Pichiorri raises both procedural and substantive claims under this clause.  But neither claim provides a plausible basis for relief.

### 1. Procedural Due Process

Pichiorri first asserts that the Ohio State officials violated the Due Process Clause because they did not provide adequate process before disclosing their report to medical journals and to her current employer (the City of Hope Medical Center).  To trigger the clause's procedural protections, however, a challenger must show that a state actor has threatened to deprive the challenger of something that falls within one of the clause's three categories: "life, liberty, or property."  *Id.*; *see Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  This case involves the Due Process Clause's protections for "liberty."  What activities does this word reach?  Most obviously, people have a liberty interest in avoiding physical confinement by the government.  *See Wilkinson v. Austin*, 545 U.S. 209, 221–22 (2005); *McClendon El v. Washington*, 144 F.4th 900, 904 (6th Cir. 2025).  And state law can create other types of liberty interests—such as a prisoner's interest in obtaining DNA evidence, *see Gutierrez v. Saenz*, 606 U.S. 305, 313–14 (2025), or a driver's interest in traveling on the public roads, *see Paul v. Davis*, 424 U.S. 693, 711 (1976).

Yet not everything that state law protects creates a liberty interest under the Due Process Clause.  Of most note, people do not have a liberty interest in their "reputation" *alone*—even though state defamation law has long sought to preserve that reputation from injurious false claims.  *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *see Segler v. City of Detroit*, 2024 WL 5135735, at *3 (6th Cir. Dec. 17, 2024).  So state actors do not violate due process each time they make allegedly false claims about a person without giving the person a hearing to prove the truth.  *See Paul*, 424 U.S. at 701–12.  The Supreme Court has instead established a "stigma plus" test for asserting a due-process violation based on a state actor's defamatory statements.  *Siegert*, 500 U.S. at 234; *see Segler*, 2024 WL 5135735, at *3.  Under this test, plaintiffs can establish a liberty interest subject to due-process protections only if they identify a harmful "effect" on a more "tangible" item—such as a "right or status previously recognized by state law"—in addition to the harm to their reputation.  *Paul*, 424 U.S. at 701, 711.  If, for example, a state actor alleges that a public employee committed misconduct when firing the employee, the employee

may have a right to due process based on the reputational harm *plus* the termination.  *See Siegert*, 500 U.S. at 233.

Pichiorri's complaint did not plausibly assert a "liberty" interest under this stigma-plus test.  To be sure, she alleged that the Ohio State officials "harmed her reputation" by falsely telling medical journals and the City of Hope Medical Center that she committed research misconduct.  Am. Compl., R.37, PageID 284.  But she did not identify an adequate "plus."  She had already left Ohio State's employment when allegations of research misconduct were first made against her and when the Ohio State officials later accused her of misconduct.  She thus cannot allege that they defamed her "in the course of" firing her from the university.  *Paul*, 424 U.S. at 710; *see Murtha v. Rossford Exempted Vill. Sch.*, 2021 WL 4950238, at *5 (6th Cir. Oct. 25, 2021); *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 31–32 (2d Cir. 1994).  Next, the Ohio State officials did recommend that Ohio State prohibit Pichiorri from obtaining any future employment with the university.  Pichiorri, however, does not even try to treat this employment ban as the "plus" for her due-process claim (perhaps because she does not plan to return to the university).  She has thus forfeited any potential theory along these lines.  *See Bannister*, 49 F.4th at 1016–17.

Pichiorri responds that the disclosure of the misconduct allegations to the City of Hope Medical Center "diminished . . . her role as a senior leader" there and caused "one of her own staff" members to quit.  Am. Compl., R.37, PageID 283.  She adds that the National Institutes of Health removed her from a "coveted panel" on which she had "permanent membership" and had long served.  *Id.*, PageID 283–84.  But unlike when government officials fire an employee, *see Paul*, 424 U.S. at 710, prohibit an adult from buying alcohol, *see Wisconsin v. Constantineau*, 400 U.S. 433, 436–37 (1971), or bar an ice-skating instructor from using a public rink, *see Mertik v. Blalock*, 983 F.2d 1353, 1363 (6th Cir. 1993), the Ohio State officials *themselves* did not inflict these harms.  Rather, Pichiorri relies on the actions of *third parties* (at the City of Hope or the National Institutes of Health) who acted in response to the defamation.  We have left open whether a plaintiff can assert a due-process claim where (as here) the public actor that allegedly defamed the plaintiff does not commit the additional injury that qualifies as the "plus" under the stigma-plus test.  *See Segler*, 2024 WL 5135735, at *4.  And other courts appear to

disagree on this question. *Compare URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 10 (1st Cir. 2011), *with Velez v. Levy*, 401 F.3d 75, 88–90 (2d Cir. 2005).

At day's end, though, we need not decide the question because we can reject Pichiorri's claim on narrower grounds. The Supreme Court has explained that a plaintiff raising a stigma-plus claim must identify some change in "a right or status previously recognized by state law" apart from the reputational harm. *Paul*, 424 U.S. at 711. And neither of Pichiorri's two alleged injuries show an actionable change to a cognizable interest. Start with the alleged harms at the City of Hope Medical Center. She does not allege that the City of Hope took any personnel action against her, such as a discharge, demotion, or the like. Rather, she alleges (vaguely) that she suffered a "diminished" "role" at the City of Hope and that a staff member resigned. Am. Compl., R.37, PageID 283. Other courts have held that some significant personnel actions (such as a temporary suspension or a change in duties) do not establish an adequate "plus" for due-process purposes. *See Patterson v. City of Utica*, 370 F.3d 322, 332 (2d Cir. 2004); *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) (Alito, J.); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 526, 531 (7th Cir. 2000); *Hughes v. Whitmer*, 714 F.2d 1407, 1417 (8th Cir. 1983); *Silva v. Bieluch*, 351 F.3d 1045, 1048 (11th Cir. 2003). Pichiorri, by comparison, has alleged far less. Her complaint identifies no more than a harm to her "future employment opportunities," *Siegert*, 500 U.S. at 233–34, at the City of Hope because she now has a worse reputation as a researcher. That harm falls short under the stigma-plus test. *See id.*

This conclusion leaves Pichiorri's removal from a "coveted panel" at the National Institutes of Health as the only remaining injury that could qualify as a "plus." Am. Compl., R.37, PageID 283–84. Yet other circuit courts have recognized that government contractors who have "merely lost one" contract (but who can apply for other contracts in the future) do not make out a stigma-plus claim. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 316 (4th Cir. 2012) (quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994)); *see Khan v. Bland*, 630 F.3d 519, 533–35 (7th Cir. 2010); *Latessa v. N.J. Racing Comm'n*, 113 F.3d 1313, 1318 (3d Cir. 1997). At most, Pichiorri's complaint alleges this type of loss. Indeed, the complaint provided no details about the panel. We have no idea how the National Institutes of Health picked people for the panel. We have no idea what the panel did. We have no idea if the

position was paid or voluntary.  And we have no idea whether Pichiorri could seek to join similar panels at the National Institutes of Health in the future.  Given the lack of details, the complaint did not assert a "plausible claim" that this removal rose to the required level of harm.  *Iqbal*, 556 U.S. at 679.  Pichiorri has thus failed to identify the required "plus" to make out a stigma-plus claim under the Due Process Clause.

### 2. Substantive Due Process

Pichiorri also asserts that the Ohio State officials violated the substantive component of the Due Process Clause.  The Supreme Court has held that this clause can prohibit the government from depriving an individual of "liberty" no matter the procedure that the government provides.  *See Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024).  This type of substantive-due-process claim can arise from executive action when officials engage in arbitrary conduct that "shock[s] the contemporary conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  Given the "open-ended" nature of this shocks-the-conscience test, *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933 (6th Cir. 2020) (citation omitted), the Supreme Court has cautioned that courts must "exercise the utmost care" before finding it met, *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  The Due Process Clause prohibits "only the most egregious official conduct," such as pumping a criminal suspect's stomach against his will to recover evidence of a crime.  *Lewis*, 523 U.S. at 846–47 (discussing *Rochin v. California*, 342 U.S. 165 (1952)).  It does not, by contrast, "supplant traditional tort law" duties of care.  *Daniels v. Williams*, 474 U.S. 327, 332 (1986); *see Collins*, 503 U.S. at 128.

Pichiorri claims that the Ohio State officials engaged in conscience-shocking behavior when they disclosed the research-misconduct allegations to medical journals and the City of Hope Medical Center over two years after the investigation had been completed.  She argues that these disclosures shock the conscience because they ran afoul of a then-applicable confidentiality rule issued by the Office of Research Integrity.  This rule required an institution to "maintain[]" the confidentiality of "records or evidence" that identify the subjects of an investigation "[e]xcept as may otherwise be prescribed by applicable law[.]"  42 C.F.R. § 93.108(b) (2005).  And Pichiorri says that the Ohio State officials had no reason for their disclosures except "malice" towards her.  Appellant's Br. 34.

This claim falls short for several reasons. To start, as we have explained, Pichiorri's complaint has not identified an adequate "liberty" interest worthy of *procedural* protections under the Due Process Clause. This conclusion might suffice to foreclose her *substantive* claim too. After all, "it would be an odd result" for the same word in the Fourteenth Amendment ("liberty") to change meanings depending on whether a plaintiff asserts a substantive-due-process claim or a procedural-due-process claim. *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 402 (3d Cir. 2000). How could the allegedly defamatory statements fall within the word "liberty" in the one context but not the other? At the least, Pichiorri's failure to identify a liberty interest even worthy of procedural protection goes a long way toward showing that the challenged conduct "does not shock the conscience" under substantive due process. *Lewis*, 523 U.S. at 855.

Next, Pichiorri's substantive-due-process theory would constitutionalize the common law of defamation. She alleges classic defamatory conduct: that the Ohio State officials "adversely" "affect[ed]" her in her "profession" and "reputation" by publishing false statements about her. *Cf. Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008) (citation omitted). And Pichiorri even pursued a state-law defamation claim that the district court dismissed without prejudice. But the Supreme Court's cases bar us from reading the Due Process Clause as a "font of tort law" that supersedes Ohio defamation rules. *See Paul*, 424 U.S. at 701. So she cannot pursue a "defamation" claim under the guise of substantive due process. *See Jenkins v. Rock Hill Loc. Sch. Dist.*, 513 F.3d 580, 590 (6th Cir. 2008). Put another way, disseminating this sort of false information alone is not so "egregious" as to shock the conscience. *See Lewis*, 523 U.S. at 846. And that fact remains true even if the Ohio State officials acted with "malice," as Pichiorri claims. The Supreme Court has made clear that plaintiffs lack "constitutional protection for the interest in reputation" alone even when a defendant acts with a malicious mindset. *Siegert*, 500 U.S. at 234.

Lastly, the federal confidentiality rule cannot save Pichiorri's claim. The Constitution does not codify this privacy regulation. To the contrary, we have held that substantive due process protects a person's privacy only when the government's disclosure of "personal information could lead to bodily harm" or when the disclosed information contains "sexual,

personal, and humiliating" details. *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), and *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998)). Yet Pichiorri makes no claim that the disclosure threatened her physically; rather, she claims it threatened her career. *Cf. Lambert*, 517 F.3d at 444. And the research-misconduct allegations did not contain intimate details about her personal life like the details that we have found protected in past cases (such as "confidential and intimate details of a rape"). *See Bloch*, 156 F.3d at 676, 685–86. In sum, neither Pichiorri's claim that the Ohio State officials defamed her nor her claim that they violated a confidentiality regulation plausibly alleged conscience-shocking behavior.

We affirm.