Anthony J. Trenga, United States District Judge
Plaintiffs are twenty-five United States citizens who claim they are included in the Government's Terrorism Screening Database, referred to colloquially as the Government's terrorist watch list (the "TSDB" or "Watch List"). They allege this status subjects them to additional screening when traveling by air or entering the country at a land border or port, and can impact other rights, such as the ability to buy a gun, to work in certain parts of an airport, or to obtain the necessary license to transport hazardous materials. In this action, Plaintiffs challenge their alleged inclusion in the TSDB on the grounds that it violates (1) procedural due process (Count I), (2) substantive due process (Count II), (3) the Administrative Procedure Act (Count III), (4) the Equal Protection Clause (Count IV), and (5) the non-delegation doctrine (Count V). Pending before the Court is Defendants' Motion to Dismiss the Amended Complaint [Doc. No. 28] (the "Motion"). Defendants contend that Plaintiffs' claims are not justiciable, and to the extent they are, Plaintiffs have failed to plead facts that make any of their claims plausible. For the reasons below, the Motion will be GRANTED IN PART and DENIED IN PART.
I. BACKGROUND
Briefly summarized, Plaintiffs allege the following facts in their Amended Complaint, which, together with all reasonable inferences, are taken as true for the purposes of the Motion:[1]
In September 2003, the Attorney General, pursuant to a presidential directive, established the Terrorism Screening Center (the "TSC") as a multi-agency center for coordinating information pertaining to terrorist activity. Am. Compl. (ECF No. 22), ¶ 51. The TSC, which is administered by the Federal Bureau of Investigations (the *458 "FBI"), manages the Goverment's consolidated Terrorism Screening Database, sometimes referred to as the Government's terrorist watch list (the "TSDB" or "Watch List"). Id. The TSC determines whether to place individuals in the TSDB based on "nominations" received from the National Counterterrorism Center (the "NCTC") and the FBI. Two subsets of the TSDB are known as the Selectee List and the No Fly List. Id. ¶ 52. Individuals on the No Fly List are prohibited from boarding commercial flights, whereas individuals on the Selectee List are required to undergo enhanced screening before doing so. Id.
Plaintiffs are twenty-five United States citizens who are included in the TSDB.[2] Plaintiffs are all Muslim (or, in the case of Baby Doe 2, born to a Muslim family). Id. ¶¶ 13-37. An indeterminate number of Plaintiffs are also on the Selectee List.[3] Id. ¶ 52. Defendants are the Principal Deputy Director of the TSC, the Deputy Director of Operations of the TSC, the Administrator of the Department of Homeland Security's ("DHS") Transportation Security Administration (the "TSA"), the Director of TSA's Office of Redress, the Director of the NCTC, the Director of the FBI, and the Director of the U.S. Customs and Border Protection ("CPB").Id. ¶¶ 38-45.
Plaintiffs, in general, are routinely subjected to additional screening when they fly on a commercial airplane and when they enter the country at a land border or port, although the frequency and invasiveness of that secondary screening varies. For example, Plaintiff Anas Elhady ("Elhady") is subject to secondary inspection "every time" he flies. Id. ¶ 142. Elhady also "is routinely referred to secondary inspection, handcuffed and detained by CBP at land border crossings when he attempts to re-enter the United States from Canada," which can last "approximately four to twelve hours." Id. ¶ 159. Plaintiff Ahmad Al Halabi ("Halabi") is subject to secondary screening "every time" he flies; "is frequently unable to board his flights until he is 'cleared' by DHS," which "oftentimes takes hours"; and has missed flights due to "prolonged searches and interrogations." Id. ¶¶ 219-221. Halabi was also handcuffed by CBP officers when reentering the United States in 2014 through a land border following vacation in Canada and detained in a holding cell for approximately two to *459 three hours, and in a waiting area for another three to four hours, during which time the officers confiscated cell phone. Id. ¶¶ 222-23. Because of this treatment, "Halabi no longer travels by air nor does he travel to Canada by land unless absolutely necessary for business purposes." Id. ¶ 225. In April 2014, Plaintiff Wael Hakmeh ("Hakmeh") "was referred to secondary screening and subjected to a prolonged interrogation" after his flight home from a business trip to Turkey. Id. ¶¶ 250-51. Since then, Hakmeh sometimes, but not always, has been subjected to secondary screening when he flies. Id. ¶¶ 254-59. In August 2016, a TSA agent removed Plaintiff Hassan Fares ("Fares") from the plane after boarding for his flight and required him to go through security again, even though he had already gone through security, during which time he was "subjected to extensive searches and pat downs." Id. ¶¶ 454-56. These actions caused Fares to miss his flight. Id. ¶ 457. Plaintiff Zuhair El-Shwehdi ("El-Shwehdi") has been subjected to secondary screening every time he flies since 2011 and "is frequently unable to board his flights until he is 'cleared' by DHS," which "can take hours." Id. ¶¶ 464-65. "Frequently, upon returning from a flight," El-Shwehdi "is escorted from the gate or, on at least two occasions off of the plane from his seat, by FBI and/or TSA agents, before he is detained and subjected to prolonged questioning and searches of his person and belongings," which has caused him to miss connecting flights. Id. ¶¶ 466-69.
Based on their experiences, most of the Plaintiffs have submitted an inquiry with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP"), which is administered by the TSA. See, e.g., id. ¶¶ 226, 239, 305. Under DHS TRIP, travelers who have been referred for additional screening or delayed or denied airline boarding for any reason, including because he or she believes she was erroneously placed on the Watch List, can inform TSA and request that it review the situation. See 49 C.F.R. §§ 1560.201 - 207. If the traveler's name is a match or near match with a name on the Watch List, "TSA, in coordination with the TSC and other appropriate Federal law enforcement or intelligence agencies, if necessary, will review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response." 49 C.F.R. § 1560.205(d). This process includes research and review of information on the Watch List and on related United States government information systems. At the conclusion of this review, DHS TRIP informs the traveler that the process has concluded. While the redress process can result in the correction of erroneous information, the concluding letter neither confirms nor denies whether the individual is on the Watch List or the Selectee List. However, pursuant to court orders requiring the Government to provide enhanced procedural protections for United States Citizens on the No Fly List, individuals can learn if they are on the No Fly List through the DHS TRIP process. Plaintiffs who have submitted DHS TRIP inquiries, other than those who have received letters informing them that there is no reason they should not be able to fly, have either received no response as of the filing of the Amended Complaint or have received acknowledgement letters neither confirming nor denying their status on the Watch List. See, e.g., id. ¶¶ 187, 390.
In addition to enhanced screening, Plaintiffs have also experienced a number of other consequences, which they have reason to believe are attributable to their inclusion on the Watch List. For example, Western Union does not allow Plaintiff Yaseen Kadura to conduct wire transfers, *460 which, on information and belief, is because the TSC informed Western Union that he was on the Watch List. Id. ¶ 195. Plaintiff Doe 1's accounts at JPMorgan Chase Bank, TCF Bank, and PNC Bank were closed without explanation or notice soon after he was first subjected to secondary screening while flying, which he believes was based on the banks' being informed of his inclusion in the TSDB. Id. ¶¶ 491-93. On June 30, 2016, when Plaintiff Ibrahim Awad ("Awad") attempted to test drive a vehicle at a Chevrolet car dealership in Sterling Heights, Michigan, a sales associate informed him that, "although he was 'not supposed to tell' " Awad, Awad's "name showed up as being designated on the federal terror watch list" when the associate input his information in the dealership's system. Id. ¶¶ 346-47. According to the sales associate, "Awad was not permitted to test drive or purchase any vehicles until the dealership obtain clearance from the FBI allowing him to do so." Id. ¶ 348. Around thirty minutes later, the sales associate told Awad that the FBI sent an email clearing Awad to test drive the vehicle. Id. ¶ 350. Plaintiff Osama Hussein Ahmed was "unable to apply for employment at the airport where his brother was employed," as a result of being added to the No Fly List. Id. ¶ 211. The local police treated Plaintiff John Doe 4 ("Doe 4") as threatening, which he believes was based on the TSC disseminating his Watch List status to local police. In particular, Doe 4 saw a denotation, "Possible Terrorist," beside his name on a local police officer's screen when he was giving the officer a witness statement following a minor traffic incident. Id. ¶¶ 540-42. On two other occasions, police officers approached Doe 4's car on traffic stops with guns drawn. Id. ¶ 543. Doe 4 was also detained in jail overnight after an officer found an airsoft gun in his car. Id. ¶ 546. While being fingerprinted at the jail, Doe 4 saw that his paperwork said, "FBI Hold" and "no phone," and the fingerprinting officer told him "he must have 'done something really bad to get the FBI involved,' and that he 'thinks something is going down.' " Id. ¶ 548-49.
Plaintiffs also allege that inclusion in the Watch List impacts a number of other legal rights. For example, they note that under New Jersey law, individuals on the Watch List are prohibited from buying a gun, and other states are considering similar measures. Id. ¶ 71. Inclusion on the Watch List can also prevent an individual from obtaining the HAZMAT license necessary to transport hazardous materials, as the Government's security screening includes a Watch List-cross reference. Id. ¶ 73. Similarly, Watch List status can prevent an individual from obtaining a job at an airport or with an airline, as there are restrictions on the ability to enter the "sterile areas" of airports. Id. ¶ 74. Watch List status is also given to courts when making bail determinations and can result in the denial or revocation of a Federal Aviation Administration license. Id. ¶ 76-77.
Furthermore, based on Plaintiffs' personal experiences, the publicly available legal consequences of being on the Watch List, government and other publications, and the public statements of goverment officials, Plaintiffs believe their Watch List status is distributed beyond just Defendants' agencies and airlines, including to other government agencies, state and local law enforcement, foreign governments, gun sellers, car dealers, financial institutions, and courts. See, e.g., id. ¶¶ 62-77.
II. LEGAL STANDARD
A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. See Randall v. United States , 30 F.3d 518, 522 (4th Cir. 1994) ;
*461 Republican Party of N.C. v. Martin , 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiffs complaint as true ... it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro , 178 F.3d 231, 244 (4th Cir. 1999) ; see also Trulock v. Freeh , 275 F.3d 391, 405 (4th Cir. 2001). In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted," Jenkins v. McKeithen , 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, Fayetteville Investors v. Commercial Builders, Inc. , 936 F.2d 1462, 1465 (4th Cir. 1991).
Moreover, "the complaint is to be liberally construed in favor of plaintiff." Id. ; see also Bd. of Trs. v. Sullivant Ave. Props., LLC , 508 F.Supp.2d 473, 475 (E.D. Va. 2007). In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); see also Giarratano v. Johnson , 521 F.3d 298. 302 (4th Cir. 2008). As the Supreme Court stated in Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged."
The party invoking the court's jurisdiction typically bears the burden of proving the existence of federal subject matter jurisdiction. See Ellenburg v. Spartan Motors Chassis, Inc. , 519 F.3d 192, 200 (4th Cir. 2008). "[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." Kerns v. United States , 585 F.3d 187, 193 (4th Cir. 2009).
III. ANALYSIS
A. Justiciability
1. Lack of Jurisdiction
Defendants contend that the Court lacks jurisdiction over Plaintiffs' claims to the extent that Plaintiffs challenge the adequacy of the DHS TRIP process, which Defendants contend amounts to a TSA order that the courts of appeals have exclusive authority to review under 49 U.S.C. § 46110. The Fourth Circuit, however, has rejected this same contention in connection with a challenge to the No Fly List. See Order, Mohamed v. Holder , No. 11-1924 (4th Cir. May 28, 2013). The Court finds no reason not to apply that holding to Plaintiffs' challenge to the Watch List. In that regard, the Fourth Circuit reasoned that placement on the No Fly List "necessarily requires scrutiny of both the TSC's and the TSA's actions," and " 49 U.S.C. § 46110 gives [the courts of appeals] broad powers of review over orders of the TSA" but not "similar independent authority over the TSC." Id. at 5. Plaintiffs' claims also "challenge the inter-agency actions of the TSC and the TSA" and are therefore within the scope of the Fourth Circuit's holding and reasoning. See id. ; 49 C.F.R. § 1560.205(d) ("TSA, in coordination with the TSC and other appropriate Federal law enforcement *462 or intelligence agencies, if necessary, will review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response.").
2. Standing
Defendants next contend that Plaintiffs have not adequately established their standing to bring these claims. In particular, Defendants argue that Plaintiffs have not adequately pleaded a real and immediate threat of injury because the facts alleged in the Amended Complaint do not contain sufficient detail from which to infer Plaintiffs' present status on the Watch List and the consequences flowing therefrom (e.g., additional screening when flying or reentering the country).
To establish standing, a plaintiff must set forth specific facts to demonstrate that (1) he has "suffered an 'injury in fact' ... which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical"; (2) there exists "a causal connection between the injury and the conduct complained of"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and footnote omitted). Plaintiffs must demonstrate standing for every claim, but a claim is justiciable if even only one plaintiff has standing to raise it. Bostic v. Schaefer , 760 F.3d 352, 370-71 (4th Cir. 2014). Plaintiffs have adequately alleged a constitutional injury in fact. The Amended Complaint contains sufficient factual detail to infer at this stage that Plaintiffs are presently on the Watch List and face ongoing, real-world consequences as a result, such as additional screening when they fly or enter the country and the inability to obtain a job at an airport. Therefore, Plaintiffs have standing to assert their claims.[4]
B. Count 1: Plaintiffs' Procedural Due Process Claim
The Due Process Clause guarantees that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The procedural component of due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." D.B. v. Cardall , 826 F.3d 721, 741 (4th Cir. 2016) (internal quotation marks omitted). A procedural due process claim requires a plaintiff to show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." Shirvinski v. U.S. Coast Guard , 673 F.3d 308, 314 (4th Cir. 2012). As a threshold matter, therefore, the government action complained of must "deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge , 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). If government deprivation concerns an interest protected by the Due Process Clause, a court must weigh three factors to determine what process is *463 due: (I) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335, 96 S.Ct. 893 ; see also Washington v. Harper , 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) ("The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case.").
1. Government Deprivation of a Cognizable Liberty Interest
Plaintiffs contend that their inclusion on the Watch List deprives them of the following interests protected by procedural due process: (1) the right of movement, and (2) liberty interests under the stigma-plus test.[5] When the Due Process Clause is invoked, the inquiry begins "with a determination of the precise nature of the private interest that is threatened." Lehr v. Robertson , 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). For that reason, and as an initial matter, Plaintiffs' broadly characterized "right of movement" fails to adequately describe the liberty interest at stake. Rather, Plaintiffs' movement-related liberty interests involve the right to travel by airplane or reenter the United States without being detained for additional screening.
a. Movement-Related Liberty Interest
While it is undisputed that procedural due process is applicable to certain liberty interests created by statute, there is no clear test to determine those procedurally protected liberty interests that derive implicitly from the Due Process Clause itself. See Kerry v. Din , --- U.S. ----, 135 S.Ct. 2128, 2136, 192 L.Ed.2d 183 (2015) (Scalia, J., plurality opinion); id. at 2142 (Breyer, J. dissenting).[6] The three-justice plurality in Din found that procedurally protected liberty interests are those within the historic understanding of the Due Process Clause and, at most, also include implied fundamental liberty interests for the purposes of substantive due process. See id. at 2133-38. In contrast, the four-justice dissent favored a comparative approach, finding that procedurally protected liberty interests are those "sufficiently important" to "flow 'implicit[ly]' from the design, object, and nature of the Due Process Clause." Id. at 2142 (alteration in original). One district court to address whether inclusion on the Selectee List triggers procedural due process protections concluded that "[g]ovemment action implicates the right to travel under the Due Process Clause when it 'actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right.' " Beydoun v. Lynch , No. 14-cv-13812, 2016 WL 3753561, at *4 (E.D. Mich. July 14, 2016) (quoting Attorney Gen. of N.Y. v. Soto-Lopez , 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (Brennan, J., plurality opinion) ) (holding that plaintiffs had not adequately alleged a *464 procedural due process claim because, among other reasons, they had not alleged that they were deterred from travel).
The Court need not decide at this stage precisely which test determines whether the travel-related liberty interest asserted here is entitled to procedural protection. No matter which judicially recognized test is used, Plaintiffs have adequately alleged a procedurally protected liberty interest. In that regard, Plaintiffs allege that their placement on the Watch List or the Selectee List subjects them to invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port. Based on their personal experiences, Plaintiffs further allege that this additional screening can entail their being detained for hours while they are searched and questioned, and that such screening has caused them to avoid travel.
Taking these allegations as true, Plaintiffs have plausibly alleged at this stage that their inclusion in the Watch List or Selectee List caused them to suffer a deprivation of a liberty interest as that term is historically understood. The invasion of that liberty interest is no less tangible or unanchored in historical recognition than other interests previously found to deserve procedural protections. See, e.g., Din , 135 S.Ct. at 2143 (Breyer, J., dissenting) (listing procedurally protected liberty interests, including, for example, a student's right not to be suspended from class and a mentally ill prisoner's right not to take psychotropic drugs). Plaintiffs also allege that they have actually been deterred from traveling as a result of actual detentions. See Beydoun , No. 14-cv-13812, 2016 WL 3753561, at *4. Plaintiffs have therefore adequately alleged a cognizable liberty interest based on the consequences they suffer as a result of their travel.
b. Stigma-Plus Reputational Interest
Procedural due process protections also extend to certain reputational injuries under the so-called "stigma-plus" test. To state a cognizable procedural due process claim under that test, "a plaintiff must demonstrate that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status." Shirvinski , 673 F.3d at 315 (citing Paul v. Davis , 424 U.S. 693, 711, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ). With respect to the "stigma" prong-the reputational injury- the Court previously noted:
The Fourth Circuit has recognized in at least one case a 'constitutional harm' based on the inclusion of defamatory information in a non-public government file if there is a 'likelihood' of dissemination to the public. Sciolino v. City of Newport News , 480 F.3d 642, 650 (4th Cir. 2007) ; but see Bishop v. Wood , 426 U.S. 341, 384, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (the due process clause of the Fourteenth Amendment is not implicated 'when there is no public disclosure' of the allegedly defamatory information and the defendant has no otherwise legally recognized interest at stake)."
Mohamed v. Holder , No. 1:11-cv-50, 2011 WL 3820711, at *7 (E.D. Va. Aug. 26, 2011) (" Mohamed I "). Here again, it is unsettled precisely how broadly defamatory information must be disseminated by the government to satisfy the stigma prong. See, e.g., Palka v. Shelton , 623 F.3d 447, 454 (7th Cir. 2010) ("The public-disclosure element requires that the defendant actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large."); Johnson v. Martin , 943 F.2d 15, 17 (7th Cir. 1991) (holding dissemination only within the proper chain of command does not constitute public disclosure). The "plus" prong must be satisfied by a change *465 in "a right or status previously recognized by ... law," Paul , 424 U.S. at 711, 96 S.Ct. 1155, not simply damage that "flows from injury caused by the defendant to a plaintiff's reputation." Siegert v. Gilley , 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). For example, there is no stigma-plus claim where the government's actions "may have affected [the plaintiff's] private employment prospects" in the future but did not result in a changed legal status such as losing a government job or formally being barred from government contracting. See Shirvinski , 673 F.3d at 315.
Here, Plaintiffs allege, based on their personal experiences and government and other public reports, that their status in the TSDB has been disseminated to third parties outside the relevant federal agencies and airlines, including state and local authorities, courts, foreign governments, gun sellers, banks, and car dealers. Plaintiffs' factual allegations plausibly allege that the dissemination of the Watch List may be so widespread that it is tantamount to public disclosure, even if only distributed to other government and private entities that need the information for official objectives. Accordingly, Plaintiffs have alleged facts that plausibly establish the stigma prong. Plaintiffs also plausibly allege that inclusion on the Watch List causes or substantially contributes to a number of tangible consequences to their legal rights or status, including, inter alia , foreclosing their ability to buy certain guns in certain states, to obtain the necessary license to transport hazardous materials, and to obtain certain jobs at an airport. Plaintiffs have therefore adequately alleged a cognizable, protectable interest under the stigma-plus test.
2. The Process Due
The "central meaning of procedural due process" is that "[p]arties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." Fuentes v. Shevin , 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (internal quotation marks omitted); see Mathews , 424 U.S. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' ") (quoting Armstrong v. Manzo , 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) ); D.B. v. Cardall , 826 F.3d 721, 741 (4th Cir. 2016) ("And when the government deprives a person of a protected liberty or property interest, it is obliged to provide notice and opportunity for hearing appropriate to the nature of the case.") (internal quotation marks omitted). Plaintiffs contend that because the Government refuses to notify individuals whether they are included in the TSDB, and therefore denies them an opportunity to participate in challenging their status, there are effectively no procedural protections. The Government concedes that "the existing process does not permit" individuals "to learn their status with respect to a watchlist" but contends that its internal process provides sufficient procedural protections from erroneous deprivations, without any opportunity to be heard. Defs. Mem. of Law in Support of Defs.' Mot. to Dismiss the Am. Compl. (ECF No. 29), at 41.
Plaintiffs' allegations plausibly allege a claim for a procedural due process violation. The Government's "trust us" approach is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest, including the right to be heard. Nevertheless, the ultimate merits of that claim are tethered to the Mathews factors, which are "fact-intensive consideration[s]," which "when considered within the context of [these] allegations, necessarily require an evidentiary record beyond that presented to the Court in connection with the defendants'
*466 motion to dismiss." Mohamed v. Holder , 995 F.Supp.2d 520, 538-39 (E.D. Va. 2014) (" Mohamed II ").
C. Count 2: Plaintiffs' Substantive Due Process Claim
Unlike procedural due process, substantive due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.' " Collins v. City of Harker Heights , 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (citation omitted); Reno v. Flores , 507 U.S. 292, 301-02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("[S]ubstantive due process ... forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (internal quotation marks omitted). It "provides heightened protection against government interference with certain fundamental rights and liberty interests," which are held to a more exacting standard of strict scrutiny. Washington v. Glucksberg , 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). To survive strict scrutiny, the government must demonstrate that its interference is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest. Hawkins v. Freeman , 195 F.3d 732, 739 (4th Cir. 1999). But the government only needs a rational basis for its interference with non-fundamental rights and liberty interests. Id.
For an asserted right to be deemed fundamental for the purposes of substantive due process, it must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Glucksberg , 521 U.S. at 721-22, 117 S.Ct. 2258 (internal quotation marks and citations omitted). As with the procedural due process inquiry, "a careful description of the asserted fundamental liberty interest" is required to make that determination. Id. at 722, 117 S.Ct. 2258 (internal quotation marks omitted); Flores , 507 U.S. at 302, 113 S.Ct. 1439 ("Substantive due process analysis must begin with a careful description of the asserted right, for the doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.") (internal quotation marks and alteration omitted).
While Plaintiffs also contend here that their substantive due process claim must be assessed based on the general "right of movement," the analysis again calls for a more precise articulation of the right at issue. Here, Plaintiffs claim that as United States citizens who have never been convicted of a crime and are not under indictment or subject to arrest for any identifiable conduct, they have the right, anchored in the right to travel, and protected under substantive due process, to board a commercial airline and enter the country free of predetermined additional screening. But however one characterizes the right at issue, the impact of enhanced screening upon that right does not make the government's action impermissible no matter how rigorous the procedural protections for determining who is subjected to such screening. For these reasons, and those previously stated in Mohamed v. Holder , 266 F.Supp.3d 868, 876 (E.D. Va. 2017) (" Mohamed III "), Plaintiffs fail to state a claim for a violation of substantive due process.
D. Count 3: Plaintiffs' Administrative Procedure Act Claim
Plaintiffs claim that Defendants violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by placing them *467 in the TSDB "without a constitutionally adequate legal mechanism," which Plaintiffs contend was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The issues in this APA claim essentially conflate with Plaintiffs' constitutional claims, and for the reasons stated above with respect to Plaintiffs' procedural due process claim, the Court concludes that Plaintiffs' factual allegations make plausible their claim that Defendants' actions were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.
E. Count 4: Plaintiffs' Equal Protection Claim
The Equal Protection Clause prohibits the government from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." Equity In Athletics, Inc. v. Dep't of Educ. , 639 F.3d 91, 108 (4th Cir. 2011). To state a claim of unconstitutional discrimination based on a facially neutral law or policy, a plaintiff must allege facts that make it plausible that the law or policy "has been applied in an intentionally discriminatory manner" or "has an adverse effect on a protected group, and ... the adoption of the statute or policy was motivated by discriminatory animus." Williams v. Hansen , 326 F.3d 569, 584 (4th Cir. 2003) ; Sylvia Dev. Corp. v. Calvert Cty., Md. , 48 F.3d 810, 819 (4th Cir. 1995) (Even when a government "action disparately impacts members of a particular [protected] group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an 'invidiously discriminatory' intent.").
The publicly disclosed criteria used in connection with the Watch List are facially neutral. See Mohamed II , 995 F.Supp.2d at 525-26. Nevertheless, Plaintiffs contend that they have plausibly pleaded intentional discrimination with respect to the TSDB based on the disproportionate number of Muslims that are included in the Watch List. Plaintiffs only factual allegation in support of that contention is that persons living in Dearborn, Michigan, a town of approximately 100,000 residents with a high Arab and Muslim population, are disproportionately included in the Watch List. Even accepting as true this factual allegation, and recognizing that disparate impact can evidence discriminatory intent in certain circumstances, see Sylvia Dev. Corp. , 48 F.3d at 819, Plaintiffs have failed to allege facts sufficient to plausibly allege that the Watch List was created based on, or operates through, intentional discrimination. Therefore, Plaintiffs have failed to state claim for a violation of the Equal Protection Clause.
F. Count 5: Plaintiffs' Non-Delegation Claim
Plaintiffs finally contend that Congress violated the non-delegation doctrine and that TSA and TSC exceeded their authority by creating the Watch List. But Congress explicitly directed TSA, "in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers ... to identify individuals on passenger lists who may be a threat to civil aviation or national security," and "take ... appropriate action with respect to that individual." 49 U.S.C. § 114(h)(3). As explained previously, "the Court concludes that Congress has provided 'intelligible principles' both as to the goals TSA should seek to achieve *468 and also how it should go about achieving them, while leaving the day-to-day implementation of the scheme to TSA." Mohamed III , 266 F.Supp.3d at 885. Therefore, Plaintiffs have failed to state a claim for a violation of the non-delegation doctrine.
IV. CONCLUSION
For these reasons, the Court concludes that Plaintiffs' claims are justiciable, and that Plaintiffs have pleaded facts that make plausible their claims that Defendants violated their procedural clue process rights (Count I) and the APA (Count III), but have not sufficiently alleged that Defendants violated their substantive due process rights (Count II), the Equal Protection Clause (Count IV), or the non-delegation doctrine (Count V). Accordingly, it is hereby
ORDERED that Defendants' Motion to Dismiss the Amended Complaint [Doc. No. 28) be, and the same hereby is, GRANTED IN PART and DENIED IN PART; it is GRANTED as to Plaintiffs claims for a violation of substantive due process (Count III), the Equal Protection Clause (Count IV), and the non-delegation doctrine (Count V), and these claims are hereby DISMISSED; and it is otherwise DENIED.

Certain of these facts, particularly some of the statutory and regulatory background, are supplemented, where appropriate, with matters of public record. Further background on statutory and regulatory framework is also found in the Mohamed opinions cited herein.

Although the Amended Complaint contains claims and allegations based on the No Fly List, Plaintiffs do not currently contend that any Plaintiff is on the No Fly List. Plaintiff Mark Amri alleges that he was on the No Fly List in January 2016 but that following his request for a review of his status, he received a letter from DHS in September 2016 stating, "the U.S. Government knows of no reason, related to your inquiry, that you should be unable to fly." Am. Compl. ¶¶ 366-76. Plaintiffs also notified the Court on January 12, 2017, that the other three Plaintiffs alleged to be included on the No Fly List, Ausama Elhuzayel, Donald Thomas, and John Doe No. 4, have received similar letters since Plaintiffs filed the Amended Complaint. See Notice of Recent Factual Developments Pertaining to Plaintiffs Ausama Elhuzeyel, Donald Thomas, and John Doe No. 4 (ECF No. 43). All four of these Plaintiffs have also been able to fly subsequently. Id. at 2 n.2; Am. Compl. ¶ 375. It is plausible based on Plaintiffs' allegations in the Amended Complaint, however, that they remain on the Selectee List and/or the Watch List.

Plaintiffs' allegations include references to both the Watch List and the Selectee List and do not precisely allege that each Plaintiff is on the Selectee List, although all Plaintiffs allege that they are on the Watch List and have had similar experiences when traveling. Given Plaintiffs' limited access to information concerning the Watch List and the Selectee List, and the Court's obligation to construe the Plaintiffs' allegations in a light most favorable to them, the Court will assume for the purposes of this Motion that all Plaintiffs are alleging the same constitutional deprivations as a result of being included in the TSDB.

The Court also finds that Plaintiffs have alleged facts that make their claims against the CBP plausible at this stage. Plaintiffs allege that the CBP enforces and implements the challenged actions of the other Defendants, including the detention of persons on the Watch List for additional screening when they reenter the country at a land border or port. and accordingly that the CBP has engaged in the actions that Plaintiffs challenge as illegal. Thus, it is plausible that the CBP may need to be included in any remedial orders.

The Amended Complaint also asserts that Plaintiffs have "a liberty interest in nonattainder (ie: the interest against being singled out for punishment without trial)." Am. Compl. ¶ 565. But Plaintiffs have abandoned nonattainder as a liberty interest on which to base their procedural due process claim.

The controlling concurrence in Din did not address this question but rather assumed a procedurally protected liberty interest in finding that the procedures at issues were constitutionally adequate. See 135 S.Ct. at 2139-41 (Kennedy, J., concurring).